UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,


               -against-                            S7 98 Crim. 1023 (LAK)


ADEL ABDEL BARY,

                        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OPINION

Appearances:

Sean S. Buckley
Rachel P. Kovner
Stephen J. Ritchin
Assistant United States Attorneys
Preet Bharara
UNITED STATES ATTORNEY

Andrew G. Patel
Lauren Kessler
LAW OFFICES OF ANDREW G. PATEL

Linda Moreno
LAW OFFICE OF LINDA MORENO

Ahmed Ghappour
LAW OFFICES OF AHMED GHAPPOUR

*Attorneys for Defendant Adel Abdel Bary*

LEWIS A. KAPLAN, *District Judge.*

Defendants Kahlid Al Fawwaz and Adel Abdel Bary were indicted in this Court in 2000 for, among other things, conspiring with Usama Bin Laden and others to kill Americans abroad by, among other means, bombing the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, bombings in which 224 people reportedly were killed and many more injured.

This case is now before the Court on motions by defendant Abdel Bary to dismiss the indictment as violative of the First Amendment and to suppress statements he made to U.K. law enforcement in 1998.

*Facts*

Al Fawwaz and Abdel Bary are charged on the same superseding indictment (S7), and the government plans to try them jointly. The superseding indictment contains 308 counts. Counts One through Six charge defendants with conspiracies to murder, bomb, and maim. Al Fawwaz is charged in Count 1 (Conspiracy to Kill United States Nationals), Count Three (Conspiracy to Murder); Count Five (Conspiracy to Destroy Buildings and Property of the United States), and Count Six (Conspiracy to Attack National Defense Utilities). Abdel Bary is charged in Counts One and Counts Four through Six. Counts Seven through Two- Hundred and Eighty-Six charge Abdel Bary and others,[1] but not Al Fawwaz, with substantive crimes related to the U.S. embassy bombings. Neither defendant is charged in the remaining counts.

Abdel Bary moves (1) to dismiss the indictment as violative of the First Amendment and (2) to suppress statements he made to United Kingdom officials while he briefly was in custody

---

[1] The other defendants on these counts have been convicted or are not available for trial with Abdel Bary for other reasons.

in the United Kingdom in 1998.

*Discussion*

A.    *Dismissal of the Indictment*

The Indictment charges, *inter alia*, that defendants Abdel Bary and Al Fawwaz "together with other members and associates of al Qaeda, Egyptian Islamic Jihad and others . . . conspired to kill nationals of the United States."[2]  These defendants were charged also with participation in a conspiracy to destroy buildings and property of the United States, which had as one object to "bomb American facilities anywhere in the world."[3]  Notably, for purposes of this motion, the Indictment describes the history of al Qaeda and explains that al Qaeda "opposed the United States for several reasons," the first of which is that "the United States was regarded as an 'infidel' because it was not governed in a manner consistent with the group's extremist interpretation of Islam."[4]

Mr. Abdel Bary takes issue with the Indictment's use of the phrase "extremist interpretation of Islam."  He contends that "[u]nder the First Amendment of the Constitution, the Government does not have the right to decide what forms of religion are 'normal' versus 'extreme.' . . . .  The Government's labeling of the defendant's belief in Islam as 'extremist' is disapproving of an infringes on Mr. Abdel Bary's religious freedoms."[5]  Thus, he argues, the Indictment violates

---

[2]    Indictment ¶ 10.

[3]    *Id.* ¶¶ 26, 27.

[4]    *Id.* ¶ 2.

[5]    DI 1173, at 2-3.

that Establishment Clause and the Free Exercise of the First Amendment.

Abdel Bary's argument is unpersuasive. Accordingly, the motion to dismiss the Indictment is denied, substantially for the reasons stated in the government's memorandum.

B.      *Suppression of Statements Made to U.K. Officials*

1.      *Whether Abdel Bary's Statements to U.K. Officials Were Voluntary*

a.      *The Arrest and the Interviews*

Abdel Bary was arrested by British police on September 23, 1998.[6]  During brief periods on the next three days, Abdel Bary was questioned at a London police station by two British detective constables.[7]  Before the interview began on the first day, Abdel Bary was given an opportunity to consult with his lawyer,[8] who remained present throughout the questioning.[9]  Adbel Bary's lawyer explained to him: "my job here is to look after your legal rights.  And what that basically means I obtain information from the police officers which then I discuss with you."[10]  He explained also that "at this stage I can say that I only have very limited disclosure and consequently my advice is extremely limited based on that disclosure.  And consequently should there be introduction of any fresh evidence or information, I will seek to intervene, and try to explain and

---

[6]      Bary Aff. at 1.

[7]      Buckley Decl. Ex. C (Record of Tape Recorded Interview, Adel Abdel Bary, Sept. 24, 1998), at 1.

[8]      *Id.* at 3.

[9]      *Id.* at 1.

[10]      *Id.* at 1-2.

advise you on how best to deal with information."[11]

> The detective constable who conducted the interview advised Abdel Bary that he had "[t]he right to free and independent legal advice. You can speak to a solicitor in private at any time of day or night and this legal advice is free. You can speak to a solicitor in person. If you do not want to speak to a solicitor in person, you can speak on the telephone. If you do want legal advice the interview can be delayed unless certain exceptions apply. As there is a solicitor present already, I will carry on with this interview. Do you understand everything that I have said to you?"[12]

Abdel Bary responded that he did.[13] The detective constable then informed Abdel Bary: "You do not have to say anything but it may harm your defence if you do not mention when questioned something which you later rely on in court. Do you understand what that caution means?" Abdel Bary said that he did.[14]

The detective constable then questioned Abdel Bary for 45 minutes, at which point there was a break of approximately an hour during which Abdel Bary was given a cup of coffee and a "headache pill" and was permitted to consult with his lawyer again.[15] When questioning resumed, the detective constable again advised Abdel Bary that he did "not have to say anything but it may harm your defence if you do not mention when questioned something which you later rely on in

---

[11]

    *Id.* at 2.

[12]

    *Id.*

[13]

    *Id.* at 3.

[14]

    *Id.*

[15]

    Buckley Decl. Ex. D (Record of Second Tape Recorded Interview, Adel Abdel Bary, Sept. 24, 1998), at 103.

court. Anything you say may be given in evidence."[16]  Abdel Bary confirmed that he understood.[17]

The questioning resumed for 46 minutes.

Abdel Bary was interviewed three more times over the next two days.  His lawyer was present for each interview. No interview lasted more than 46 minutes.[18]  At the start of the interview on the second day, Abdel Bary's lawyer made clear that he had "grave concerns" regarding a disclosure of materials made to him by the British police.[19]  He said that

> "some of the material is unrelated.  Some of the material . . . is wrongly translated . . . which obviously limits my job and . . . furthermore . . . what concerns me is that we have to go into this interview when I'm not able to discharge my duty to protect my client's rights.  So in the light of that, my advice to my client this stage is to give no comment.  He has co-operated fully hitherto, however in the light of the current disclosure, which is troubling me a great deal, I am unable to advise him and consequently it is on my advice that he is going to give a no comment interview."[20]

After the lawyer repeated his concerns, the detective constable replied: "Okay.  As you have already said sir, he has every right not to answer any of my questions, but as you appreciate I also have a right to ask them."[21]  Abdel Bary proceeded to answer "no comment" in response to every question

---

[16]    *Id.* at 2.

[17]    *Id.*

[18]    *See* Buckley Decl. Exs. C-G.

[19]    Buckley Decl. Ex. E (Record of Tape Recorded Interview, Adel Abdel Bary, Sept. 25, 1998), at 2.

[20]    *Id.* at 2-3.

[21]    *Id.* at 4.

posed to him during that interview, as well as the two remaining ones.[22]

        Abdel Bary was released on or about September 27, 1998.

        *b.*     *Voluntariness*

        The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."[23] "It guarantees 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty. . . for such silence,'"[24] and it applies "regardless of the origin – *i.e.*, domestic or foreign – of a statement . . . [and] it does not matter whether the defendant is a U.S. citizen or a foreign national."[25] The Supreme Court has said "[t]he ultimate test" for whether a statement was "compelled" is "'the test of voluntariness. Is the [statement] the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to [make his statement], it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his [statement] offends due process.'"[26]

        The test of whether a statement was voluntarily made depends not on a single factor,

---

[22]     Exs. F, G.

[23]     U.S. CONST. amend. V.

[24]     *Weaver v. Brenner*, 40 F.3d 527, 534 (2d Cir. 1994) (quoting *Malloy v. Hogan,* 378 U.S. 1, 8, 84 (1964)).

[25]     *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 177, 199 (2d Cir. 2008).

[26]     *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).

but upon an "examin[ation of] all of the circumstances surrounding the interrogation to see if police overreaching overcame a suspect's will and led to an involuntary" statement.[27] "'Specifically, these circumstances include 1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police.'"[28] Moreover, as Abdel Bary rightly points out, coercion can be "mental as well as physical; the blood of the accused is not the only hallmark of an unconstitutional inquisition."[29]

Abdel Bary contends that the statements he made during his interviews with the U.K.

---

[27]

*Weaver v. Brenner*, 40 F.3d 527, 536 (2d Cir. 1994).

[28]

*In re Terrorist Bombings*, 552 F.3d at 213 (quoting *Parsad v. Greiner,* 337 F.3d 175, 183 (2d Cir. 2003)). The Supreme Court has noted that

> "[i]n determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e.g., Haley v. Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; his lack of education, *e.g., Payne v. Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975; or his low intelligence, *e.g., Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; the lack of any advice to the accused of his constitutional rights, *e.g., Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; the length of detention, *e.g., Chambers v. Florida*, . . . ; the repeated and prolonged nature of the questioning, *e.g., Ashcraft v. Tennessee*, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and the use of physical punishment such as the deprivation of food or sleep, *e.g., Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut*, . . . 367 U.S., at 603, 81 S.Ct., at 1879. The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances."

[29]

DI 1173 (quoting *Garrity v. New Jersey*, 385 U.S. 493, 496 (1967)); *see also United States v. Stein*, 440 F. Supp. 2d 315 (suppressing statements made by defendants who were economically coerced).

police "were not the product of a free and unrestrained will."[30]  He argues that the warning he was given by the detective constable – that he did not have "to say anything but it may harm [his] defence if [he] do[es] not mention something which [he] later rel[ies] on in court" – was "inherently coercive because it penalized silence."[31]  The warnings allegedly caused Abdel Bary to believe that "if he wanted to prevent his silence from being used against him, he had no choice but to answer the questions posed."[32]  He contends also that his lawyer was not properly equipped and prepared to provide him meaningful assistance and advise him of his rights.  Thus, he argues, all statements he made during the five interviews with U.K. officials must be suppressed.

An examination of the relevant circumstances – including the defendant's characteristics, the conditions of the interrogation, and the conduct of the police – establishes that Abdel Bary's will was not overborne.

*First*, Mr. Abdel Bary is a well-educated and intelligent individual.  Indeed, he was a lawyer in his native Egypt and was a partner in his own law firm there at the time of his arrest.[33]  He obtained a "Law Bachelor Degree" in Egypt as well as a "Post Graduate Diploma in Islamic Science from the . . . Alzaqazeg College."[34]  He was thirty-eight years old when he was arrested and

---

[30]     DI 1173, at 17.

[31]     *Id.*

[32]     *Id.* at 17-18.

[33]     Ex. C at 12-13.

[34]     *Id.* at 12.

interviewed by the British police.[35]  A review of the transcripts from the interviews reveals that Abdel Bary understood the questions that were posed to him; he even asserted his own objections when he believed the questions were irrelevant.[36]  Abdel Bary had lived in the U.K. for several years preceding his arrest and, although he did not speak English, an interpreter always was present during the interviews to translate the questions posed to him and his responses to those questions.

*Second*, the conditions of Mr. Abdel Bary's interrogation clearly were acceptable and not coercive.  Abdel Bary was questioned for approximately three hours over the course of three days.  No interview session lasted longer than 46 minutes, and he was given lengthy breaks between each session.  Mr. Bary was provided with coffee and "headache pills" on several occasions.  The only people present for the interviews were two detective constables, an interpreter, and Mr. Abdel Bary's lawyer.[37]

Mr. Abdel Bary was represented at every interview by a British lawyer.  His lawyer informed him that his job was to "look after [Abdel Bary's] legal rights."[38]  Before his first and second interviews, Abdel Bary was given the opportunity to consult with his lawyer independently.[39]

---

[35]

*Id.* at 4.

[36]

*See, e.g.*, *id.* At 11 ("I will answer him on the question but I don't believe it is a question in connection or relating to what I am here for.").

[37]

*See In re Terrorist Bombings*, 552 F.3d at 213 (statements voluntary where "there is no evidence in the record suggesting that the conduct of Al-'Owhali's interrogators was oppressive; quite the contrary: they permitted breaks, provided food and water, limited the duration of the sessions, and never placed him in restraints).

[38]

*Id.* at 1.

[39]

*See* Ex C, at 3; Ex. D, at 1.

And Mr. Abdel Bary's lawyer told him during his third interview that, "should [Abdel Bary] require further legal advice," he could "indicate that to the officers who will then stop the interview and allow us further time for consultation."[40] Indeed, at the beginning of the third interview, Abdel Bary's lawyer advised him to respond "no comment" to every question posed to him, which Abdel Bary did throughout the remaining interviews.[41]

*Third*, the conduct of the British police who interviewed Mr. Abdel Bary did not overbear his will.

Abdel Bary contends that he impermissibly was given a Hobson's Choice between exercising his right to remain silent and risking an adverse inference that might have been drawn from that silence.[42] This false choice, he argues, rendered any statement he made involuntary.

The Supreme Court in *Miranda v. Arizona*[43] held that "if a person in custody is to be subjected to interrogation, he must be informed in clear and unequivocal terms that he has the right to remain silent."[44] By contrast, Mr. Abdel Bary was told that he did not have to say anything, but that it could harm his defense if he did not mention something when questioned that he later relied upon at trial. He contends that this warning was inconsistent with *Miranda* and caused him to believe that he was obliged to respond to the questions posed to him. Mr. Abdel Bary is incorrect.

---

[40] Ex. E, at 2-3.

[41] *Id.*

[42] DI 1173, at 18.

[43] 384 U.S. 436 (1996).

[44] *Id.* at 467.

As this Court previously has held, a defendant who contends that a statement was coerced "must adduce evidence *both* that the individual subjectively believed that he or she had no real choice but to speak *and* that a reasonable person in that position would have felt the same way."[45]  Abdel Bary fails to meet either prong.

That Mr. Abdel Bary subjectively believed that he had no choice but to speak is belied by the fact that he affirmatively chose to stop speaking on several occasions throughout the interviews, refusing to answer certain questions the detective constable posed to him.  Beginning at the start of the third interview, Abdel Bary refused to respond to any question whatsoever. Instead, he responded "no comment" to every question asked of him.[46]  He explained himself why he chose stop answering the detective's questions.[47] Had Abdel Bary believed that he had no choice but to answer the detective's questions, he would not have refused to answer them.[48]

Nor would it have been objectively reasonable for Abdel Bary to believe otherwise. As the government rightly points out, the instruction Abdel Bary received regarding his silence was not coercive; it was an accurate description of his rights under U.K.[49] and, indeed, U.S. law.

It is true that the government here may not use at trial the silence of a defendant who

---

[45]

*United States v. Stein*, 440 F. Supp. 2d 315, 328 (S.D.N.Y. 2006).

[46]

Ex. E, at 5.

[47]

*Id.*

[48]

*Stein*, 440 F. Supp. 2d at 328 ("There would be little reason to exclude a statement as obtained in violation of the Fifth Amendment if the speaker did not in fact feel compelled to make the statement.").

[49]

Defendants do not dispute that the instruction was an accurate description of Mr. Abdel Bary's rights under U.K. law.

has received a standard *Miranda* warning while in federal or state custody.[50]  This is because "*Miranda* warnings inform a person that he has the right to remain silent and assure him, at least implicitly, that his subsequent decision to remain silent cannot be used against him."[51]  The government cannot "induce[] silence by implicitly assuring the defendant that his silence would not be used against him" and then use that silence against him in court.[52]  The same is not true, however, where, as here, a defendant does not receive the standard *Miranda* warning, remains silent during questioning, and later testifies at trial.  The Supreme Court has held that "[i]n the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, [it] do[es] not . . . violate[] due process of law . . . to permit cross examination as to postarrest silence when a defendant chooses to take a stand."[53]

For an obvious reason – his presence in U.K., not U.S. custody – Mr. Abdel Bary was not given a standard *Miranda* warning; he was not told – implicitly or explicitly – that a decision to remain silent would not be used against him.  Instead, he was informed that "it may harm [his]

---

[50]
     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[51]
     *Jenkins v. Anderson*, 447 U.S. 239 (1980).

[52]
     *Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (citing *Jenkins*, 447 U.S. at 239).

[53]
     *Id.* at 607; *see also Jenkins*, 447 U.S. at 235 ("the Fifth Amendment is not violated when a defendant who testifies in his own defense is impeached with his prior silence").  Mr. Abdel Bary attempts to distinguish his case from *Fletcher* and *Jenkins* because those cases involved defendants whose pre-arrest silence later was used against them at trial.  Abdel Bary, by contrast, was in custody when his interviews occurred.  But the rule set forth in *Fletcher* and *Jenkins* holds true whether a defendants' silence is pre- or post-arrest.  *See, e.g.*, *United States v. Reynolds*, 27 Fed. App'x 60, 62 (2d Cir. 2001) ("Moreover, as Mr. Reynolds had received no assurances from the government that his silence would not be used against him, reference by the government to his post-arrest silence in cross-examination or in summation does not implicate his due process rights.)

defence if [he] d[oes] not mention when questioned something which [he] later rel[ies] on in court."[54]  That warning was not coercive.  It was an accurate description of the U.K. law and, coincidentally, of the situation Mr. Abdel Bary will face in U.S. court should he choose to testify.

*  *  *

An examination of the totality of the circumstances – including Abdel Bary's characteristics, the conditions in which the interviews occurred, and the conduct of the British police[55] – leads inescapably to the conclusion that Abdel Bary's will was not overborne and that the statements he made were freely given.

2.     *Whether Abdel Bary Was Questioned in Violation of* Miranda

Mr. Abdel Bary contends also that his statements should be suppressed because he was not given the proper warnings under *Miranda v. Arizona*.

---

[54]  *E.g.*, Ex. C, at 3.  This instruction could also be read to inform Mr. Abdel Bary that if, in answering the questions posed to him, he omits or misrepresents certain information and later attempts to include that include or alter that information at trial, his earlier statement can be used against him.  This is of course true whether or not Mr. Abdel Bary received a standard *Miranda* warning.

[55]  Abdel Bary's contention that his statements were coerced because his attorney had not been provided sufficient material to enable him to provide Abdel Bary meaningful assistance lacks merit.  *First*, the transcripts make clear that the British police made continuous disclosures to Mr. Abdel Bary's lawyer.  *See, e.g.*, Ex. C, at 3; Ex. D, at 1-2, 12; Ex. E, at 2-8; Ex. F, at 2-3.  *Second*, Abdel Bary's claim would fail even if the police had not been so forthcoming with information and materials.  The Supreme Court has "'never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'" *Colorado v. Spring*, 479 U.S. 564, 576-77 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 422 (1986)).

a.    *The Standard*

As noted, *Miranda* provides that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendants unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[56]  "[T]he law is settled[, however,] that statements taken by foreign police in the absence of *Miranda* warnings are admissible if voluntary."[57]  There are two exceptions to this general rule.  "One exception is the 'joint venture' doctrine, under which statements elicited during overseas interrogation by foreign police in the absence of *Miranda* warnings must be suppressed whenever United States law enforcement agents actively participate in questioning conducted by foreign authorities."[58]  The other exception to the general admissibility of voluntary statements taken by foreign officials are statements obtained in circumstances that "shock the judicial conscience."[59]  Mr. Abdel Bary contends that the first exception applies here.

The Second Circuit has yet to define the precise contours of the joint venture doctrine where, as here, Americans were not directly involved in or present for the questioning conducted by foreign actors.  Nor has it explicitly determined whether it is defendant's burden to establish that a joint venture existed or the government's burden to prove that it did not.  In the absence of any guidance on the point, the Court assumes without deciding that the government must establish the

---

[56]    *Miranda*, 384 U.S. at 478.

[57]    *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003).

[58]    *Id.*

[59]    *Id.* at 146.

absence of a joint venture.

The Second Circuit has made clear that the government's burden is not a heavy one. If the government can show that the United States and foreign law enforcement went no further than providing assistance and sharing information, a joint venture has been disproven. This is particularly true where U.S. authorities do not themselves conduct the interview in question.[60] Put another way, a joint venture may be found only in "circumstances under which the relationship between American and foreign authorities . . . amount to a joint willful attempt to evade the strictures of *Miranda*"[61] or a situation in which "United States police officers simply used foreign police officials as instruments" in conducting investigation and interviews.[62]

The same is true even where U.S. authorities are involved in the investigations leading up to or following the interrogation in question. For example, in *United States. v. Baguric*, the Second Circuit concluded that collaboration and close cooperation between U.S. and Canadian officials in conducting an investigation was not a joint venture because defendant's statements "were taken by a Canadian official, during his lawful pursuit of a separate and valid Canadian investigation into [defendant's] activities."[63] And in *United States v. Maturo*, the Second Circuit held that, although the American Drug Enforcement Agency provided Turkish authorities with predication for

---

[60]

    *E.g.*, *United States v. Abu Ali*, 528 F.3d 210, 228 (4th Cir. 2008) (no joint venture where "FBI supplied a list of questions" to Saudi officials to be asked at interrogation and FBI and Secret Service agents observed the interrogation because Saudis retained ultimate control over interrogation).

[61]

    *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir. 1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 (1994)

[62]

    *United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972).

[63]

    *Bagaric*, 706 F.2d at 69.

Turkish wiretaps, funded the wiretaps, and received recordings of the wiretaps, the collaboration between the Turkish and U.S. government did not constitute a joint venture.[64]  That Turkish authorities sought assistance from the DEA and provided to the DEA information from their investigation did not establish that U.S. authorities had control over the Turkish investigation.[65]

> b.      *The Evidentiary Hearing*

The Court on September 4 and 18, 2013 held an evidentiary hearing to resolve the question whether the interview of Abdel Bary was the result of a joint venture between U.S. and U.K. authorities.  Having heard testimony from witnesses who were members of the U.K. Metropolitan Police at the time of the embassy bombings as well as former FBI agents, the Court concludes that the government has established that the U.K. and U.S. did not form a joint venture

---

[64] *United States v. Maturo*, 982 F.3d 57, 62; *see also U.S. v. Lee*, 723 F.3d 134, 137, 141 (2d Cir. 2013) (Jamaican officials not "virtual agents" of U.S. officials even where U.S. and Jamaican law enforcement "ran parallel investigations of . . . organized marijuana trafficking activity" and Jamaican law enforcement provided DEA with wire taps that led to surveillance warrants in the U.S. because Jamaican investigation was independent and conducted for its own purpose); *United States v. Getto*, 11-1237-CR, 2013 WL 4779622, at *6-10 (2d Cir. Sept. 9, 2013) (Israeli law enforcement agents were not "virtual agents" of U.S. authorities for Fourth Amendment purposes even where (1) the U.S. requested by MLAT treaty that Israeli police conduct searches, (2) Israeli and U.S. law enforcement shared intelligence, and (3) U.S. law enforcement was allegedly permitted to monitor Israeli surveillance, and (4) the defendant was arrested and charged in the United States)").

*Maturo*, *Lee*, and *Getto* all were Fourth Amendment cases.  The Court in *Lee* noted that the Second Circuit has not adopted the joint venture doctrine "in the context of the Fourth Amendment."  *Lee*, 723 F.3d at 140 n.4.  It reaffirmed that holding in *Getto*.  In both Fourth and Fifth Amendment cases, however, the inquiry into whether the constitutional protections should apply to foreign investigation involves an examination of the degree of U.S. control over foreign law enforcement operations.  The Second Circuit in Fourth Amendment cases, however, does not require a finding that U.S. law enforcement created a joint venture for the purposes of evading *Miranda*, as it does in Fifth Amendment cases like this one.

[65] *Id.  See also Bagaric*, 706 F.2d at 69.

that led to Abdel Bary's arrest and questioning. *Miranda* warnings thus were not required.[66]

 

       i.        *The Investigation, the Arrests, and the Interviews*

        Two members of the U.K. Metropolitan Police, both of whom were in charge of the operation leading up to and following Abdel Bary's arrest, testified at the hearing. John Bunn was detective chief superintendent of the Antiterrorist Branch ("SO13") at the time of the embassy bombings.[67] Keith Weston was the detective chief inspector of SO13, who reported directly to Mr. Bunn.[68] Messrs. Bunn and Weston provided an overview of the structure of the Metropolitan Police during the period the period of Abdel Bary's questioning, explained how the different sections of the force worked together with respect to antiterrorist operations, and detailed the history of the operation that led to and followed Abdel Bary's arrest.

        Mr. Bunn testified that SO13 worked closely with the British Security Service ("MI5") and the Special Branch of the Metropolitan Police.[69] SO13 was "responsible for the development of evidence to ensure that matters could be brought before the courts" in the U.K.[70] MI5 was "responsible for the gathering of intelligence . . . the exploitation of it, the dissemination,

---

[66]
     The Court need not reach the question whether, assuming *Miranda* warnings were necessary, the warnings he did receive were sufficient.

[67]
     Sept. 4, 2013 Hr'g Tr. at 6:10-20.

[68]
     Sept. 18, 2013 Hr'g Tr. at 7:10-11.

[69]
     *Id.* at 7:15-25.

[70]
     *Id.* at 8:4-6.

and to ensure that . . . . people are brought before the courts if there is appropriate evidence."[71]  He explained that MI5 "gathered the intelligence from all sorts of sources and were responsible completely and had primacy in relation to intelligence on terrorist matters.  The Special Branch . . . also dealt with intelligence regarding terrorist activity."[72]  SO13 was the only branch of the three that was empowered to take "executive action" – "that is, to arrest or detain suspects" – and it only could do so after receiving adequate intelligence and briefing from the Special Branch and MI5.[73]  Thus, Mr. Bunn explained that, if SO13 was "going to send officers into home addresses, we needed to ensure that they had a good background, knowledge of what they would be looking for, what might be important and what might not be important, and also to ensure that they . . . showed respect to those who may be of another religion . . . ."[74]  MI5 and the Special Branch provided that information.

     Mr. Weston testified that, when MI5 had intelligence that they believed needed to be acted upon, officers from that service presented the intelligence to the Special Branch and SO13 at an executive liaison group ("ELG") meeting.[75]  If the ELG determined that "there w[ere] sufficient grounds that the intelligence operation be developed into an evidential operation, then a

---

[71]
   *Id.* at8:6-11.

[72]
   *Id.* at 8:14-19.

[73]
   *Id.* 13:13-19.

[74]
   *Id.* 13:18-25.

[75]
   *Id.* 9:3-5.

[Security Information Officer] SIO would be appointed" and the operation would proceed[76]

The operation that led to the arrests of Mr. Abdel Bary and Mr. Al Fawwaz was called "Operation Challenge." Operation Challenge was "an investigation that was conducted into the activities of a number of persons in London, to establish whether they were involved in the commission, preparation, or instigation of acts of terrorism" in the U.K.[77] It was conducted under Section 14 of the British Prevention of Terrorism Act of 1989, and was meant "to discover what [terrorist] activity was going on in London."[78] It initially began as an effort to gather information regarding any such activity that occurred in London regarding a potential attack on the American embassy in Albania.[79] It later broadened to include investigation of any terrorist activity within the U.K. that led to the U.S. embassy bombings.

Before any action was taken on Operation Challenge, SOI3 received an intelligence briefing from the Special Branch and MI5.[80] Subsequent to the briefing, and once Mr. Weston was satisfied that executive action was justified, search warrants were obtained, searches were conducted of various residences and offices – including those of Mr. Abdel Bary – and arrests were made.

---

[76]

DI

[77]

*Id.* at 9:3-6.

[78]

*Id.* at 10:18-11:3. *See also*, *id.* at 11:3-8. (Operation Challenge "was to prove or disprove the intelligence that these men were involved in the commission, preparation, or instigation of acts of terrorism, an d we ere trying to establish how far that involvement had gone, what it was about, what activity was taking place in London.")

[79]

*Id.* at 11:9-15.

[80]

*Id.* at 13:10-15.

Abdel Bary and Al Fawwaz were among those arrested.[81]   As noted, Mr. Abdel Bary then was interviewed by members of SO13.[82]

The testimony provided by Mr. Bunn and Mr. Weston – as well as that of the remaining witnesses – made clear that the investigation leading up to Abdel Bary's arrest, the subsequent searches, and Abdel Bary's arrest and interviews, were entirely British operations. Indeed, the purpose of Operation Challenge was to "gather sufficient useable evidence leading to either prosecution [under U.K. law] or for grounds to be made to exclude an individual from the United Kingdom . . . [because] their presence in the United Kingdom [was] not conducive to the public good."[83]  The fact that SO13 and MI5 investigated whether or not defendants had participated in any activity concerning a possible attack on the U.S. embassy in Albania, or the U.S embassy bombings in East Africa, did not render the operation any less British.  Indeed, Mr. Weston, who was responsible for determining whether and when to take executive action in the operation, testified that he did not authorize the searches and arrests until he was satisfied that he had sufficient "information that these individuals were engaged in illegal activity *within the United Kingdom* that would breach *English Law*."[84]

---

[81]

*Id.* at 13:3-9.

[82]

*Id*. at 14:12-13.

[83]

Sept. 18 Hr'g Tr. at 12:25-13:3.

[84]

*Id.* at 15:6-8 (emphasis added).  *See also*, *id.* at 43:18-25 ("the intelligence was that these individuals were involved in conspiring to undertake or had undertaken or been involved in, in some way, acts of terrorism abroad.  My role was to ascertain whether or not they were involved in the commission, preparation, or instigation of acts of terrorism in the U.K.").  Mr. Weston eventually determined that there was insufficient evidence that Al Fawwaz and Abdel Bary had engaged in these acts and released them.

*ii.*     *American Involvement*

Messrs. Bunn, Weston, and Ivan Agnew – the SO13 detective constable who interviewed Abdel Bary in September 1998 – all testified explicitly that there had been no American involvement in the investigation, searches, arrests, and interviews of defendants.  Mr. Bunn testified that neither he nor anyone in SO13 had consulted "with any representatives of the American government about whether [they] should go forward with Operation Challenge;"[85] that he had not consulted with "American authorities about whether Mr. Abdel Bary should be arrested" or questioned;[86] and that American authorities had not been involved in the questioning or preparation for questioning Abdel Bary.[87]  Mr. Weston provided identical testimony concerning the absence of any U.S. involvement in the investigation, preparation, and execution of the searches and arrests of defendants.[88]  Mr. Agnew testified that he alone determined what questions he would ask Abdel Bary in the interviews; that he received no input from anyone outside SO13 (and certainly none from any American authorities); and that Americans did not participate in the preparation for or questioning of Mr. Abdel Bary.[89]

To the extent there was any American involvement at all with respect to Operation Challenge, it was limited to two incidents.

---

[85]     Sept. 4, 2013 Hr'g Tr. at 10:7-10

[86]     *Id.* at 14:18-20; 15:1-2.

[87]     *Id.* at 15:6-10.

[88]     Sept. 18, 2013 Hr'g Tr. at 23:3-21.

[89]     *Id.* at 65:14-66:9.

*First*, ten days after the bombings in East Africa, SO13 sent four officers to the bombing sites at the U.S. embassies in Nairobi and Dar es Salaam, of whom one was Stephen Gregory. Mr. Gregory testified that he was sent to the sites "to evaluate each scene . . . to see if there was anything we could do to assist the . . . physical recovery . . . of exhibits."[90] Mr. Gregory made clear, however, that his "involvement was not in the actual investigation of either . . . bomb scene," but "to offer any advice that we might be able to give or any assistance in the physical recovery of items of debris from the bomb vehicles or anything pertaining to matters forensic that would could assist with."[91] Mr. Bunn reiterated that the purpose of sending Mr. Gregory and the other officers to East Africa was to assist in the cleanup and collection of evidence from the scene as well as to learn from the FBI about other methods of evidence collection.[92] The SO13 team was not sent to East Africa at the request of the U.S. government. And the fact that it assisted the FBI FBI in collection of evidence certainly did not render the U.K. officers who arrested and interviewed Mr. Abdel Bary "virtual agents" of the U.S. law enforcement.

*Second*, shortly after the U.S. embassy bombings in East Africa, two FBI agents were sent from New York to London to work in the FBI's London attache office.[93] One of them was John Cloonan, who testified that he was sent to "help out with the leads coming in on the bombings in .

---

[90]

Sept. 4, 2013 Hr'g Tr. at 88:22-89:1.

[91]

*Id.* at 89:7-18.

[92]

*Id.* at 19:3-12 (testifying that SO13 was "always interested in the manner in which other countries investigated large vehicle-borne improvised devices where there was a huge amount of casualties and whether anything we could learn. We had also had five such devices in London, which we had investigated, and we perhaps thought we could add something, some value to the investigation in those countries.").

[93]

Sept. 18, 2013 Hr'g Tr. at 111:10-24.

. . East Africa and also some other current investigations."[94]  He was there for a month and had

periodic contact with British police.[95]  His *only* involvement with respect to the British investigation

occurred on the morning on which the searches were conducted.  Mr. Bunn allowed Mr. Cloonan

and another FBI agent to ride in Mr. Bunn's car to the area of Mr. Al Fawwaz's residence and

observe the search from afar.  Mr. Bunn did not tell Mr. Cloonan where they were going before they

arrived at the residence, did not permit Cloonan to enter the premises or get out of the car, and

allowed Cloonan only to observe for half an hour.[96]  Although Mr. Cloonen later learned that Al

Fawwaz and Abdel Bary had been arrested and interviewed as a result of the searches, he was not

permitted to participate in any of the interviews, did not provide any questions or consultation on

what should be asked of Abdel Bary,[97] and was not even briefed on the interviews after they had

been conducted.[98]

      Clearly these limited interactions between SO13 and the FBI do not a joint venture

make.  Although Mr. Cloonan was permitted to observe the search of Mr. Al Fawwaz's residence,

his observation was extremely limited and he did not participate in the search, investigation, arrest,

---

[94]  *Id.* at 112:7-9.

[95]  *Id.* at 113:1-6.

[96]  *Id.* at 114-118.  *See also* Sept. 4, 2013 Hr'g Tr. at 20:3-9 (Bunn testifies that "[w]e would not allow [FBI agents] to go to any address or be part of any part of the evidentiary scene, but I did permit and I personally took one agent to just watch people enter the address because it was an unarmed intervention into these premises, and that was of interest to the officer.  And that's all that happened.  That was the only participation.").

[97]  *Id.* at 120:3-14.

[98]  *Id.* at 130:2-13.

or interviews.  And the fact that SO13 sent officers to assist in and learn from the FBI in the days following the embassy bombings certainly does not render Abdel Bary's arrest and interviews – which were part of the wholly British Operation Challenge – an American operation.  This Circuit and others have made clear that the fact that U.S. and foreign authorities share information and provide limited assistance to one another does not rise to the level of collaboration required to find joint venture such that *Miranda* should apply beyond U.S. borders.

### c.      *Abdel Bary's Joint Venture Arguments*

Abdel Bary nonetheless contends that his arrest and interview were conducted at the "behest of the U.S. government" and were in fact the result of a joint venture between the U.S. and U.K. authorities.  He bases his argument on two pieces of evidence, both of which can be disposed of quickly.

*First*, Abdel Bary points to testimony Mr. Gregory gave in the *United States v. Ghailani* in 2010:

> "Q:     And how was it that you came to search that particular office?
>
> "A:     It was at the behest of the U.S. authorities who requested international cooperation of the antiterrorist branch, and, following their request, that address and five others were simultaneously searched in London on the 23rd of September, 1998, to continue investigation into the bombings of the U.S. embassies in Kenya and Tanzania a month previous."[99]

Abdel Bary contends that this testimony "strongly suggests that U.K. law enforcement and the FBI

---

[99]      DI 1173, at 23 -24 (citing Transcript of Record at 1828-1829, *United States v. Ghailani*, Vol. 15, Nov. 1, 2010).

were engaged in a joint venture in the investigation of this case."[100]  But Mr. Gregory's testimony at the evidentiary hearing makes clear that (1) he lacked sufficient information in 1998 to know whether in fact the search in question had been made "at the behest of U.S. authorities", and (2) he no longer can say whether that is so.[101]

In 1998, Mr. Gregory was a "crime scene investigator and exhibits officer"in SO13.[102]  He was responsible for "examining scenes of crime and . . . the discovery, recovery, and safe custody of exhibits which may be of benefit for an investigation or be submitted for various forensic tests. . . ."[103]  Although he was involved in the September 1998 searches, he never was privy to the information, discussions, or decisions that led to the searches and arrests.[104]  While the Court accepts that Mr. Gergory's testimony in 2010 reflected what he in good faith believed at the time, he had no personal knowledge or other sufficient basis to reach the conclusion that the searches were conducted at the behest of the U.S. authorities.  And the credible evidence in this case all is to the contrary.  Thee Court therefore finds that Mr. Gregory's 2010 testimony was erroneous.

*Second*, Abdel Bary relies on a small portion of a book written by former FBI Special Agent Ali Soufan for Abdel Bary's contention that his arrest and interviews were the result of a joint venture between the U.S. and U.K. governments.

---

[100]     *Id.* at 24.

[101]     *Id.* at 96:13-16.

[102]     Sept. 4 Hr'g Tr. at 87:1-6.

[103]     *Id.* at 87:13-18.

[104]     *Id.* at 96:21-23.

Mr. Soufan was sent to London by the FBI some time after July 1999 to begin building the U.S case for extradition of Abdel Bary, Al Fawwaz, and Eidarous. In his book, *The Black Banners: The Inside Story of 9/11 and the War Against al-Qaeda*, Mr. Soufan wrote that the FBI "urged the British to arrest Fawwaz, Bary, and Eidarous in 1996, [but] they had refused."[105] This statement, Abdel Bary argues, along with several others that tangentially mention the investigations, further proves that "the FBI played a significant role in London investigation of the East Africa Embassy Bombings."[106] This argument is unpersuasive.

Mr. Soufan did not start working in the FBI until 1997. He did not become case agent on the embassy bombings investigation until 1999.[107] Thus, despite the statement in his book, he had no personal knowledge whether the FBI requested in 1996 that Abdel Bary, Al Fawwaz, and Eidarous be arrested. He readily admitted this fact at the hearing. There he stated that he did not in fact know of any specific request made in 1996, but rather was "talking [in his book] about the general perception that [people within the FBI] were having" when he joined it.[108] He further testified that he did not "later learn of any specific requests that the British authorities arrest" them.[109] He conceded that he "wasn't in the F.B.I. in 1996," but that he later on "developed an

---

[105] Sept. 18, 2013 Hr'g Tr. at 89:23-25.

[106] DI 1173, at 22.

[107] Sept. 18, 2013 Hr'g Tr. at 82:9-10; 85:20-25.

[108] *Id.* at 91:16-19.

[109] *Id.* at 90:1-7.

impression" that the FBI had urged the U.K. authorities to arrest the men.[110]  "[T]hat impression[, however] can be built on hearsay or my own impression of working the case and my own feelings of working the case.  This book is not a document, but this book is my own impression of the era."[111]

In the last analysis, Mr. Soufan's book is not credible or persuasive evidence of anything that supports a conclusion that Mr. Abdel Bary's arrest and interviews occurred pursuant to a joint venture between the U.S. and the U.K.  Indeed, when asked whether he participated in any "meetings discussing who should be arrested in September or 1998" and whether he knew what "statutes were relied on in connection with" those arrests, Mr. Soufan answered "[n]o.  That was totally a British operation."[112]

*     *     *

The evidence clearly establishes that the arrest and questioning of Mr. Abdel Bary were conducted exclusively by British authorities.  American officials were not present for and took no part in the preparation or execution of either event.  The fact that the British shared information resulting from the searches and interviews with U.S. officials, and that British authorities assisted in evidence collection from the embassy bombing sites, did not render British police officers agents or joint venturers of U.S. authorities who were employed for the purpose of evading *Miranda*.  Instead, the U.K. police conducted a "completely British operation" in which Abdel Bary was arrested and interviewed.  As this operation was not a joint venture with the U.S. government, no

---

[110]

*Id.* at 104:10-14.

[111]

*Id.*

[112]

*Id.* at 86:18-23.

*Miranda* warnings were required.[113]

## Conclusion

For the foregoing reasons, Abdel Bary's motions [DI 1172] are denied. The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated:  October 23, 2013

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[113] Abdel Bary's counsel argued at the hearing that, because Mr. Cloonan testified that "he and the FBI provided information to MI5," the defense should be provided with "information so that [they] can call the member of MI5 who attended the elective liaison group" meetings at which Operation Challenge was discussed. Sept. 18, 2013 Hr'g Tr. at 146:16-121. As the Second Circuit and others have held, however, the fact that a foreign government provides information to the U.S. government does not rise to the level of collaboration sufficient to trigger extraterritorial application of the Fourth or Fifth Amendments. *See, e.g., Maturo*, 982 F.3d 57, 62; *Lee*, 723 F.3d at 141;. *Getto*, 2013 WL 4779622, at *6-10. This is particularly the case where, as here, American officials did not participate in and were not present for the interviews at which the statements defendant seeks to suppress were made. Abdel Bary's request therefore is denied.