

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 27, 2020

**By ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re:  *United States v. Adel Abdel Bary*, 98 Cr. 1023 (LAK)

Dear Judge Kaplan:

  The Government respectfully submits this letter in opposition to defendant Adel Abdel Bary's September 16, 2020 motion for a reduction in sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. 2154). The Government opposes the defendant's motion for two independent reasons. First, the defendant has not exhausted his administrative remedies, as required by Section 3582(c)(1)(A). Second, the sentencing factors to be considered under 18 U.S.C. § 3553(a) outweigh the extraordinary and compelling circumstance presented by the defendant's obesity, and weigh strongly against a reduction in his sentence.

**I. Background**

  The defendant was a senior member of Egyptian Islamic Jihad ("EIJ"), a group dedicated to the forceful overthrow of the Egyptian government and to violent opposition to the United States. (Presentence Investigation Report revised Dec. 22, 2014 ("PSR") ¶ 26). By at least February 1998, EIJ had effectively merged with the terrorist group al Qaeda and joined it in targeting American civilians. (*Id.*). Between 1996 and 1997, Bary was appointed the leader of the London cell of EIJ. (*Id.*). His principal role for EIJ and al Qaeda was to communicate with the media on behalf of the organizations' leaders, and to facilitate communications between and among his co-conspirators. (*Id.*). During the months leading up to the August 7, 1998 bombings of the American embassies in Kenya and Tanzania, which killed 224 people, injured more than 4,500, and inflicted immense property loss, Bary interacted directly with the leaders of EIJ. (PSR ¶¶ 40, 43, 44, 57). He participated in disseminating to media organizations claims of responsibility for the bombings in the name of the "Islamic Army for the Liberation of the Holy Places," which included threats of future similar attacks if the organization's demands were not met. (PSR ¶ 44, 60). After the bombings, Bary continued to interact with the leaders of EIJ and al Qaeda, including Usama bin Laden. (PSR ¶ 46). He admitted that he agreed with others to murder U.S. nationals, military and civilian, anywhere in the world, and arranged for messages to be transmitted from members of the media to his co-conspirators, including Ayman al Zawahiri, the leader of EIJ, and Usama Bin Laden. (PSR ¶¶ 26, 61).

On October 1, 2014, Bary pled guilty to a three-count information, charging him with conspiring him to murder U.S. nationals outside the United States, in violation of 18 U.S.C. § 371, conspiring to make threats concerning an attempt to kill, injure, and intimidate an individual and unlawfully to damage and destroy property by means of an explosive, in violation of 18 U.S.C. §§ 844(e) and (n), and making threats concerning an attempt to kill, injure, and intimidate an individual and unlawfully to damage and destroy property by means of an explosive, in violation of 18 U.S.C. § 844(e). (*See* PSR ¶¶ 2-5). On February 6, 2015, this Court sentenced Bary to 300 months in prison, the statutory maximum sentence. (Dkt. 1912; PSR ¶¶107-08). Bary, who is 60 years old, is incarcerated at Fairton FCI in southern New Jersey and is scheduled to be released next month, on October 28, 2020. *See* https://www.bop.gov/inmateloc (search "Adel Abdel Bary"). There is an ICE detainer on Bary, a deportable alien who is expected to be deported to the United Kingdom, which granted him political asylum in 1991. (PSR at second unnumbered page, p. 26, ¶¶ 90, 113). Bary expects to live in London after he is deported. (Dkt. 2154 at 5).

On May 26, 2020, the defendant asked the warden of Fairton FCI "to be considered for early home confinement under the CARES Act, COV-19," a request that was denied because "[a]t this time, you do not meet the criteria due to your pending detainer." (Dkt. 2154 at 9). On September 16, 2020, the defendant filed the instant motion, requesting a reduction in sentence to time served based on the COVID-19 pandemic and pursuant to 18 U.S.C. § 3582(c)(1)(A). (Dkt. 2154).

## II.   Applicable Law

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, the Court "may not modify a term of imprisonment once it has been imposed except" as provided by statute. As relevant here:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

*Id.* The applicable policy statement, which appears at § 1B1.13 of the U.S. Sentencing Guidelines, provides that a reduction in sentence is permitted if: "[e]xtraordinary and compelling reasons warrant the reduction," U.S.S.G. § 1B1.13(1)(A); "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13, in turn, describe three circumstances in which a defendant can show "extraordinary and compelling reasons": (A) the defendant has a serious medical condition, such as a terminal illness; (B) the defendant is, among other things, at least 65 years old and seriously deteriorating; or (C) the defendant's family circumstances have changed such that the defendant is the only available caregiver for a minor child or incapacitated spouse.  U.S.S.G. § 1B1.13 app. note 1(A)-(C).  The application notes also allow a catchall condition where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* at app. note 1(D).  Subsection (A) is most relevant here.  It provides in full:

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id.* at app. note 1(A).

Thus, there are four prerequisites for granting a compassionate release motion under the First Step Act.  First, a defendant must have exhausted his administrative rights.  *See* 18 U.S.C. § 3582(c)(1)(A).  Second, the court must find that that "extraordinary and compelling reasons warrant" a reduction of sentence. 18 U.S.C. § 3582(c)(1)(A)(i).  Third, the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a).  And, fourth, the court must find that release is consistent with the Sentencing Commission's policy statements.  18 U.S.C. § 3582(c)(1)(A).  As the proponent of the motion, the defendant bears the burden of proving each of these prerequisites.  *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) ("The defendant has the burden to show he is entitled to a sentence reduction.") (citing *Butler*); *United States v. Givens*, No. 14 CR 546-09 (CM), 2020 WL 4699042, at *2 (S.D.N.Y. Aug. 13, 2020) (same).

### III. The Defendant's Motion

The defendant moves for compassionate release and to reduce his sentence to time served.  (Dkt. 2154 at 1).  He argues that extraordinary and compelling reasons warrant his release because he is "particularly susceptible to sickness and complication should he contract" COVID-19 because he is 60 years old and suffers from asthma.  (*Id.* at 3, 5).  Similarly, he argues with respect to the Section 3553(a) sentencing factors that "the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents to [his] health and safety."  (*Id.* at 6).  "The purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness," he contends, and further claims, as part of his argument that the Section 3553(a) factors warrant his release, that continuing to imprison him would violate "the Eighth Amendment's prohibition on cruel and unusual punishment."  (*Id.*).

### IV. Discussion

#### A. The Defendant Has Not Exhausted His Administrative Rights

Defendant claims that he has exhausted his administrative rights based on the request attached to his motion as Exhibit A, which he characterizes as a "request for compassionate release . . . ."  (Dkt. 2154 at 3).  But Bary did not ask for compassionate release, or a reduction in his sentence.  Rather, he asked "to be considered for early home confinement under the CARES Act" and cited "COV-19."  (*Id.* at 9).  As this Court has noted, "requests for home confinement . . . are not requests for compassionate release," and such a request does not exhaust the defendant's "administrative remedies as required by Section 3582(c)."  *United States v. Merlo*, No. 17 CR 738 (LAK), 2020 WL 3001039, at *1 (S.D.N.Y. June 4, 2020) (footnote omitted); *see also United States v. Casado*, No. 19 CR 6156 (FPG), 2020 WL 3410455, at *1 (W.D.N.Y. June 22, 2020) (explaining that the CARES Act expanded the authority of BOP to transfer inmates to home confinement under certain conditions).  Defendant therefore has failed to exhaust his administrative remedies and his motion should be denied on this ground alone.

#### B. The Defendant's Age and Asthma Are Not Extraordinary And Compelling Reasons That Could Justify His Release, But His Obesity Is Such A Reason

In determining whether a medical condition constitutes an extraordinary and compelling reason that warrants a sentence reduction, the Government follows the current guidance from the Centers for Disease Control ("CDC").  In that guidance, the CDC lists those medical conditions that, according to current data, present an increased risk of severe illness from COVID-19.  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Sept. 27, 2020).  That list does not include asthma.  Rather, the CDC guidance makes clear that unlike individuals with certain other underlying medical conditions, such as chronic obstructive pulmonary disease, who "*are* at increased risk of severe illness from COVID-19," individuals with moderate to severe asthma "*might be* at an increased risk."  *Id.* (emphasis added).  Thus courts, including courts in this district, have recently denied sentence reduction motions on the ground that a defendant's moderate to severe asthma during the COVID-19 pandemic does not constitute "extraordinary and compelling reasons."  *See, e.g.*,

4

*United States v. Pomales*, No. 16 CR 826 (LTS), 2020 WL 4677596, at *2 (S.D.N.Y. Aug. 12, 2020); *United States v. Battle*, No. 05 CR 377 (VM), 2020 WL 4677414, at *1-2 (S.D.N.Y. Aug. 12, 2020).[1]

Similarly, the CDC reports that while the risk for severe illness from COVID-19 increases with age, "[t]he greatest risk for severe illness from COVID-19 is among those aged 85 or older," and "8 out of 10 COVID-19-related deaths reported in the United States have been among adults aged 65 years and older." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed Sept. 27, 2020). Thus it is unsurprising that courts, including courts in this district, have found that being 60—or even older—does not constitute "extraordinary and compelling reasons." *See, e.g.*, *United States v. Saleh*, No. 93 CR 181, 2020 WL 3839626, at *1, *3 (S.D.N.Y. July 8, 2020) (64 years old); *United States v. Sattar*, No. 02 CR 395 (JGK), 2020 WL 3264163, at *2 (S.D.N.Y. June 17, 2020) (60 years old); *United States v. Haney*, No. 19 CR 541 (JSR), 2020 WL 1821988, at *4-5 (S.D.N.Y. Apr. 13, 2020) (61 years old).

However, a review of Bary's BOP medical records reveals that in November of last year he was diagnosed as obese, with a Body Mass Index ("BMI") of 38.[2] His weight in April of this year also would qualify him as obese, with a BMI of 36. (*See* Dkt. 2154 at 11; PSR ¶ 93 (listing Bary's height as 5'7")). This appears to be a longstanding condition, since in 2014 Bary had a BMI of 33.2. (*See* PSR ¶ 93). Obesity, defined as having a BMI of 30 or higher, is a condition that places an individual at increased risk of severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Sept. 27, 2020). Thus the defendant's obesity is an extraordinary and compelling reason that could justify a reduction of his sentence in light of the current pandemic.

That does not, however, end the analysis. Even if the defendant had exhausted his administrative remedies (which he has not), "[b]efore a court may grant an application for compassionate release, it must consider the Section 3553(a) factors to determine whether those factors outweigh the extraordinary and compelling reasons warranting compassionate release, particularly whether compassionate release would undermine the goals of the original sentence." *United States v. Merlo*, 2020 WL 3001039 at *3 (quotation marks and citation omitted). *Accord United State v. Daugerdas,* No. 09 CR 581 (WHP), 2020 WL 2097653 at *4 (S.D.N.Y. May 1,

---

[1] Prior to the CDC's most recent guidance, the CDC had listed moderate to severe asthma as a COVID-19 risk factor. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (last accessed Sept. 27, 2020). Even then, courts, including this Court, sometimes denied sentence reduction motions during the COVID-19 pandemic on the ground that a defendant's asthma did not constitute "extraordinary and compelling reasons." *E.g., United States v. Canales*, No. 16 CR 212 (LAK), 2020 WL 2319294, *3 (S.D.N.Y. May 9, 2020); *United States v. Foozailov*, No. 17 CR 262 (LGS), 2020 WL 3268688, at *2 (S.D.N.Y. June 17, 2020); *United States v. Garcia*, No. 16 CR 719-2 (RJS), 2020 WL 2539078, at *2 (S.D.N.Y. May 19, 2020).

[2] The Government is in possession of Bary's recent BOP medical records and can make them available to the Court.

2020) ("this Court's analysis does not end with a finding that "compelling and extraordinary reasons" warrant compassionate release. This Court must also "consider[ ] the factors set forth in section 3553(a)."); *United States v. Israel*, 05 CR 1039 (CM), 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019) (explaining that a court confronted with a compassionate release motion must "consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances").

### C. The 18 U.S.C. § 3553(a) Factors Clearly Outweigh the Extraordinary and Compelling Reason Presented By The Defendant's Obesity And Counsel Strongly Against A Reduction In The Defendant's Sentence

In this case the relevant factors under § 3553(a) clearly outweigh the extraordinary and compelling circumstance presented by Bary's obesity. The defendant conspired to murder Americans, military and civilian, anywhere in the world, and that conspiracy resulted in the bombings of two United States embassies that killed hundreds of people, injured thousands more, and inflicted enormous property loss. In order for Bary's sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," as well as to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant," 18 U.S.C. §§ 3553(a)(2)(A) (B) and (C), and in order to take account of the "nature and circumstances of the offense," 18 USC § 3553(a)(1), the sentence for the defendant's ideologically driven and horrific crimes should not be reduced. To do so would undermine the goals of the original sentence. These factors clearly outweigh the risks to the defendant because of his obesity. *See United States v. Shah*, No. 93 CR 180 (LAK), 2020 WL 3578103, at *2 (S.D.N.Y. June 30, 2020) (risks associated with defendant's obesity do not "outweigh the remaining sentencing factors, particularly the severity of his crimes, which point strongly against his early release.") (footnote omitted); *see also United States v. Al Kassar*, No. 07 CR 354-01 (JSR), 2020 WL 4813199, at *3 (S.D.N.Y. Aug. 19, 2020) (rejecting compassionate release based in part on "the monstrous nature of defendant's crimes"); *United States v. Cremer*, No. 12 CR 47 (ER), 2020 WL 4746569, at *6 (S.D.N.Y. Aug. 17, 2020) (rejecting compassionate release based in part on "horrific" nature and circumstances of the offense); *United States v. Gotti*, 433 F. Supp. 3d 613, 620 (S.D.N.Y. 2020) (denying compassionate release for defendant who "headed one of the most vicious and violent organized crime organizations in New York").

That is especially true because of current conditions at Fairton FCI, where the risk of contracting COVID-19 appears to have substantially diminished, and in the United Kingdom, Bary's expected destination after release, where the risk of contracting COVID-19 appears to be high and rising. As Bary notes, BOP reports that approximately 100 of the inmates at Fairton FCI have tested positive for COVID-19. (Dkt. 2154 at 4.).[3] What Bary fails to note, however, is that BOP also reports that the number of confirmed active cases among inmates at Fairton FCI is now zero, and the number of confirmed active cases among the staff is three, while 100 inmates

---

[3] Bary reports that number to be 102. BOP, as of the date of this letter, reports that number as 100. *See* https://www.bop.gov/coronavirus/ (last accessed Sept. 27, 2020).

and seven staff members have recovered from COVID-19. https://www.bop.gov/coronavirus/ (last accessed Sept. 27, 2020). This remarkable decline in the number of confirmed active cases at Fairton FCI is very likely due in part to the comprehensive measures BOP is taking to prevent the spread of COVID-19. *See* https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed Sept. 27, 2020). In contrast, the risk of contracting COVID-19 in the United Kingdom is now sufficiently high that the CDC warns against nonessential travel to the U.K. *See* https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-united-kingdom (last accessed Sept. 27, 2020). And British officials have recently warned of rising COVID-19 rates there. The British government's chief scientific adviser recently said current trends show "the epidemic is doubling roughly every seven days," https://www.npr.org/sections/coronavirus-live-updates/2020/09/21/915257112/in-a-month-u-k-could-see-50-000-new-covid-19-cases-every-day-expert-warns, and "warned the UK could see 50,000 new coronavirus cases a day by mid-October without further action." https://www.bbc.com/news/uk-51768274. Similarly, the medical director at Public Health England recently said: "The signals are clear. Positivity rates are rising across all age groups and we're continuing to see spikes in rates of admission to hospital and critical care." *Id.* These facts further undermine Bary's claim that his risk of contracting COVID-19 at Fairton FCI warrants his immediate release. *See United States v. Canales*, No. 16 CR 212 (LAK), 2020 WL 2319294, *3 (S.D.N.Y. May 9, 2020) ("although the defendant is at risk of contracting COVID-19 if he remains detained at the MCC, he would be at risk even if he were to be sentenced to home confinement") (footnote omitted); *see also United States v. Merlo*, 2020 WL 3001039 at *2 ("While the virus could resurface at Otisville, this possibility does not justify granting defendant's application.").

Bary's reliance on the Eighth Amendment's prohibition of cruel and unusual punishment, (Dkt. 2154 at 6), does not advance his claim that he should be released. Both "subjective and objective elements [are] necessary to prove an Eighth Amendment violation," *Helling v. McKinney*, 509 U.S. 25, 35 (1993), and Bary has proven neither. The subjective element when prison conditions are at issue is "deliberate indifference to inmate health or safety" on the part of prison officials. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotation marks and citations omitted). This standard "is the equivalent of criminal recklessness," *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996), and requires "that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, lead to liability." *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (citing *Farmer*, 511 U.S. at 841). Bary has not even attempted to make this showing, nor could he. BOP has made extensive efforts to prevent the spread of COVID-19 in its facilities. *E.g.,* https://www.bop.gov/coronavirus/covid19_status.jsp (describing, *inter alia*, health screening of inmates, staff and contractors, modifications of operations to maximize social distancing and suspension of social visits, most internal inmate movement, staff travel except for relocation travel, and most staff training) (last accessed Sept. 27, 2020).

Similarly, to satisfy the objective element, Bary must show that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). Bary has not attempted to, nor could he, make this showing. Virtually all people are now unwillingly exposed to some level of

7

risk of COVID-19 infection, and have no choice but to tolerate that risk. As discussed above, Bary now lives in a prison of more than 900 inmates in which it appears there are zero active cases of COVID-19 among the inmates and only three among the staff. Those circumstances do not present a risk "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* Indeed, many people around the world likely are exposed unwillingly to, and must tolerate, substantially higher levels of risk.[4]

## IV.     Conclusion

The Court should deny the defendant's motion. Bary has not exhausted his administrative rights, as required by Section 3582(c)(1)(A). Even if he had, the factors set forth

---

[4] In support of his argument that he should be released, Bary also relies on the Eighth Amendment's guarantee of adequate medical care, (Dkt. 2154 at 6), but he does not demonstrate, or attempt to demonstrate, that he is receiving inadequate medical care, or that he would receive better medical care if he were released. Indeed, with respect to COVID-19, BOP reports that there have been no deaths from COVID-19 among the inmates and staff at Fairton FCI despite the fact that 100 inmates and seven staff members have had the disease. https://www.bop.gov/coronavirus/ (last accessed Sept. 27, 2020). Nationwide, BOP reports 124 federal inmate deaths attributed to COVID-19 (four of which occurred while on home confinement) and 14,382 inmates who have had a positive test, a mortality rate of less than one percent. *Id.* In contrast, the World Health Organization now reports that there have been 41,971 COVID-19 deaths in the United Kingdom out of 429,281 confirmed COVID-19 cases, for a mortality rate of about 9.8 percent. *See* https://covid19.who.int/region/euro/country/gb (last accessed Sept. 27, 2020). Thus there is no basis for this Court to conclude either that Bary is receiving inadequate medical care or that he would receive better medical care were he to be released, even if he were to contract COVID-19. If there was some basis for the court in *United States v. Williams*, No. 3:04CR95/MCR, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020), to conclude that the defendant in that case could seek outside of prison "what may be better medical care than the BOP is obligated or able to provide, particularly given the very real threat that COVID-19 poses in the institutional environment," *id.* at *4, there is no basis to reach such a conclusion in this case.

in 18 U.S.C. § 3553(a) outweigh the extraordinary and compelling circumstance of Bary's obesity, and counsel strongly against a reduction in his sentence.

        Respectfully submitted,

        AUDREY STRAUSS
        Acting United States Attorney

By:   /s/ Stephen J. Ritchin
        Stephen J. Ritchin
        Assistant United States Attorney
        (212) 637-2503

cc:    Andrew G. Patel, Esq. (by ECF)